UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CARL DUKES,                                                    Docket No.:  1:17-CV-865 [DNH/DJS]

                              Plaintiff,                        **COMPLAINT**

              -against-                                         PLAINTIFF DEMANDS
                                                               TRIAL BY JURY
CITY OF ALBANY, RONALD MATOS,
PHILLIPPA P. GARLAND-WILCOX, as
Administrator of the Estate of KENNETH WILCOX,
ANTHONY RYAN, MICHAEL SBUTTONI,
PETER MCKENNA, and KEVIN BREEN,

                              Defendants.
------------------------------------------------------------------X

        Plaintiff CARL DUKES, by his attorneys, KELNER & KELNER, ESQS., as and for his

Complaint in the above-captioned action, hereby alleges as follows upon information and belief:

                              **Preliminary Statement**

        1.      This case arises from the unjust and wrongful conviction of plaintiff CARL

DUKES for a murder he did not commit.

        2.      On November 17, 1998, plaintiff CARL DUKES was convicted by an Albany

County jury of the murder of Erik Mitchell.  There was no physical evidence to connect him to

the crime. He was sentenced to a term of imprisonment for the murder of twenty-five years to

life.

        3.      On September 3, 2014, a man named Jeffrey Conrad, who was being interviewed

by police in Cuyahoga County, Ohio, after stabbing his girlfriend to death confessed to

murdering Mitchell.  Conrad had been identified to the Albany police as a potential suspect

during their investigation in 1996, but they had never bothered to speak to him. In his confession

to the Ohio police, Conrad described Mitchell's murder in chillingly accurate detail.  When

Albany police detectives subsequently went to Ohio to interview Conrad themselves, he taunted them for having arrested and convicted innocent men for a crime he had committed.

4.     Following Conrad's confession, plaintiff moved, pursuant to New York State Criminal Procedure Law §440.10, to vacate his conviction. His motion, which was joined by the People, was granted by the Honorable Thomas P. Breslin on July 7, 2016. All of the charges relating to the murder have either been dismissed or otherwise resolved by a verdict of acquittal.

5.     Plaintiff served nearly 18 years in jail following his conviction. He is actually innocent of the murder.

6.     His conviction for a crime he did not commit was almost entirely based on a confession that he had been coerced to give, and on other and further misconduct by the agents, servants, and employees of the Albany Police Department. In addition to plaintiff, the defendants brought false charges regarding the murder against Lavell Jones and Pierre Lyons, both of whom were also improperly coerced and/or induced to render false confessions. Jones was wrongfully convicted and remained incarcerated until his conviction was vacated at the same time as was plaintiff's. Lyons was acquitted.

7.     This action seeks damages to compensate plaintiff for the years of his life he lost while imprisoned for a crime he did not commit, the pain, suffering, psychological, economic, and other damages he has suffered in the past, and the effects his wrongful conviction will continue to have on him in the future.

### Background and Venue

8.     Plaintiff CARL DUKES is a resident of the County of Albany, State of New York.

9. Defendant CITY OF ALBANY is a municipal corporation, duly organized and existing under the laws of the State of New York.

10. At all times herein mentioned, KENNETH WILCOX was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

11. KENNETH WILCOX is deceased. On April 26, 2006, PHILLIPPA GARLAND-WILCOX was duly appointed as the Administrator of the Estate of KENNETH WILCOX. (All references herein to actions by "defendant WILCOX" refer to KENNETH WILCOX, and are alleged against, *inter alia*, the Administrator of his Estate in her representative capacity).

12. At all times herein mentioned, defendant RONALD MATOS (hereinafter "MATOS") was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

13. At all times herein mentioned, defendant ANTHONY RYAN (hereinafter "RYAN") was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

14. At all times herein mentioned, defendant MICHAEL SBUTTONI (hereinafter "SBUTTONI") was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

15. At all times herein mentioned, defendant PETER MCKENNA (hereinafter "MCKENNA") was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

16. At all times herein mentioned, defendant KEVIN BREEN (hereinafter "BREEN") was employed by the CITY OF ALBANY, by and through its Police Department, and was acting under color of state law.

17.     On July 7, 2016, plaintiff's conviction was vacated by order of the Hon. Thomas Breslin of the Supreme Court of the State of New York, County of Albany.

18.     On September 9, 2016, plaintiff duly and timely served a Notice of Claim on the CITY OF ALBANY, pursuant to General Municipal Law §50-e.

19.     On December 12, 2016, plaintiff appeared for a hearing pursuant to General Municipal Law §50-h.

20.     More than thirty days have elapsed since the service of said Notice of Claim and defendant CITY OF ALBANY and its Comptroller have failed to settle, adjust, and/or compromise the claims set forth therein.

21.     This action is timely brought against all parties.

22.     This action arises under federal law, including but not limited to, 42 U.S.C. §1983, and this Court has subject matter jurisdiction over plaintiff's claims arising thereunder.

23.     This Court has pendent jurisdiction over plaintiff's claims arising under state law.

24.     Venue is proper in the United States District Court for the Northern District of New York, pursuant to 28 U.S.C. §1391, insofar as a substantial part of the events or omissions giving rise to the claim occurred therein, and more particularly, within the County of Albany, State of New York.

## Facts

### A.    The murder of Erik Mitchell and wrongful arrest and indictment of Carl Dukes

25.     In 1996, plaintiff, then 19 years old, resided in Albany, New York.

26.     On October 4, 1996, premises located at 195 Clinton Avenue were robbed. One of the tenants of the premises was a SUNY-Albany student named Erik Mitchell. Mitchell was not home during the robbery, but two other men – Camon Wyatt and Gregson Joseph – were.

27.     The person chiefly responsible for having planned the robbery was Matthew Parsons. Parsons had met Mitchell while working in the cafeteria at SUNY-Albany and believed that Mitchell was engaged in the sale of marijuana.

28.     Four other men were involved, to varying degrees, in the robbery: Lavell Jones, Pierre Lyons, Zakee Abdul-Hameed, and plaintiff.

29.     Plaintiff's involvement in the robbery was limited and non-violent.

30.     Police quickly identified Parsons as a participant in the robbery and charged him with the crime.

31.     They also charged Lyons and Abdul-Hameed.

32.     On February 18, 1997, Mitchell was shot and killed in the doorway of his apartment, which was located within an area of the building resembling a vestibule. He had been shot by a .25 caliber bullet. Forensic evidence, which included stippling in the area of the entry wound, showed that he had been shot at close range, but that the gun had not been pressed against him. Even though the shooting took place late at night, he was still clothed. He was found by an officer in a seated position against his doorway.

33.     The police, including defendants WILCOX, MATOS, RYAN, SBUTTONI, BREEN, and MCKENNA, opened an investigation into Mitchell's murder.

34.     At all times herein mentioned, defendant BREEN held the rank of Detective Sergeant with the CITY OF ALBANY police department.

35.     At all times herein mentioned, defendant BREEN, in his capacity as Detective Sergeant, supervised the investigation into Mitchell's murder, including, but not limited to, overseeing defendants WILCOX, MATOS, RYAN, SBUTTONI, and MCKENNA.

36.     Defendants WILCOX, MATOS, RYAN, SBUTTONI, MCKENNA, and BREEN acted in concert with one another throughout the course of the investigation, and conferred regularly for such purpose.

37.     One person identified to them as a potential suspect was Jeffrey Conrad, a known felon whose girlfriend lived several doors down from Mitchell, and who was on probation. The police were told that Conrad had been attempting to purchase a firearm shortly before the time Mitchell had been murdered.

38.     The police investigating the murder, including, but not limited to the individually named defendants herein, did not speak to Conrad before plaintiff was arrested, charged, or convicted.

39.     The police never identified any forensic evidence that connected plaintiff to the murder.

40.     On February 19, 1997, Albany Police detectives, including defendant MCKENNA, spoke to Parsons about the murder, which had taken place the day before. He was informed that he was not under arrest.

41.     Parsons denied knowledge of, or involvement in, the murder, and told detectives he had an alibi.  He did not indicate, despite the queries, that he had any knowledge of the murder.

42.     On April 30, 1997, the defendants, including defendant SBUTTONI, arrested Parsons on an outstanding Superior Court warrant and detained him, with the intention of coercing and/or otherwise inducing him to implicate others in the murder.

43.     While Parsons was detained, defendants, including, but not limited to SBUTTONI, coerced and/or induced him to claim knowledge of the murder.

44.　　He purportedly told defendants, including defendant SBUTTONI, that he had "heard" that plaintiff and Zakee Abdul-Hameed had gone to Mitchell's residence on the night of the murder looking for Gregson Joseph, with the intention of either killing or intimidating him, and that plaintiff had shot Mitchell.  Parsons did not and/or could not supply any source for his purported information and did not reconcile it to his original statement and/or explain his prior failure to claim any such knowledge.

45.　　Defendants WILCOX, MATOS, RYAN, SBUTTONI, BREEN, and MCKENNA knew that these statements by Parsons were false.

46.　　Defendants WILCOX, MATOS, RYAN, SBUTTONI, BREEN, and MCKENNA should have known that these statements by Parsons were false, and recklessly proceeded nonetheless.

47.　　On September 8, 1997, plaintiff was being detained in the Albany County jail, where he was awaiting trial for an unrelated, non-violent charge.  His attorney for that charge was Betrand Gould, a public defender.

48.　　That day, plaintiff was brought from the jail to the Albany County courthouse.

49.　　He did not know why he was brought to the courthouse that day.

50.　　There was no scheduled appearance in his case.

51.　　Plaintiff had been brought to the courthouse at the behest of the Albany police, including, but not limited to WILCOX, MATOS, RYAN, SBUTTONI, MCKENNA, and BREEN.

52.　　When plaintiff arrived at the courthouse, Gould met him in his holding cell, and said that plaintiff was there to speak to the police about an ongoing robbery investigation.  Gould did not provide detail about the robbery investigation to which he was referring.

7

53.     Plaintiff was then brought to a conference room, where a number of Albany Police detectives were waiting for him, including WILCOX, MATOS, MCKENNA, and SBUTTONI.

54.     At this point, Gould, without prior warning to plaintiff, announced that "due to a conflict of interest" he would not remain in the interview, but instead would wait outside.

55.     Gould left the room, along with some of the detectives, leaving behind only plaintiff, WILCOX, and MATOS.

56.     WILCOX was, at the time, a prominent detective in the department. It later emerged that he had been leveraging the credibility he earned by his association with the police department to operate a sweeping fraudulent mortgage scheme.

57.     Defendants did not read plaintiff his *Miranda* rights, and asked him only to initial a form purporting to reflect that they had done so.

58.     The interview started at approximately 9:00 a.m., and initially concerned only the robbery of 195 Clinton Avenue. Plaintiff acknowledged his participation in the robbery, and signed a statement that MATOS had written, with WILCOX's collaboration, to that effect. At approximately 12:30 p.m., immediately after he had signed it, they broke for lunch.

59.     While writing the statement that had been explained to plaintiff as merely reflecting the information he had provided about the robbery, MATOS wrote into it that plaintiff had knowledge about the murder, even though plaintiff had said no such thing. Plaintiff, trusting that detectives had accurately recorded the information he had related about the robbery, failed to notice the reference before signing it.

60.     Defendants WILCOX and MATOS failed to tell plaintiff they had written information into his robbery statement that he had not said.

61.     Defendants, including, but not limited to, WILCOX and MATOS established a plan to that effect in advance, and collaborated to that end.

62.     After they returned from the break, the detectives began, for the first time, to question plaintiff about the murder of Erik Mitchell.

63.     Again, plaintiff was asked to initial pre-printed forms with *Miranda* warnings on them, even though defendants had never administered such warnings to him.

64.     Plaintiff was never told that he was free to terminate the interview if he wished, or that he was not in custody, and he did not understand that he had any right to terminate the interview.

65.     Plaintiff repeatedly, for a prolonged period of time, denied that he had any involvement in the murder, or had any knowledge of who had perpetrated it. He broke out in tears.

66.     Undeterred, the two detectives began to foist a story on him, telling him what he should say had happened and demanding that he adopt the account as his own. Plaintiff resisted their demands, and continued to deny knowledge of the murder.

67.     When he refused to confess to a murder he did not commit, he was told that, if he did not do so, he would receive the death penalty. Plaintiff finally relented. He later recounted at his hearing pursuant to General Municipal Law §50-h: "And I'm like I didn't do nothing. I didn't kill nobody. I told you what I did. But he wasn't going for it. And I just started signing stuff. I wasn't trying to die. I just signed my name on it. I just signed my name. I just wanted to get out of there."

68.     The information in the false statement, which was elaborately detailed, was supplied by the detectives, not plaintiff – for plaintiff had no knowledge of the murder to supply.

69.     Though phrased in the first person, and attributed to plaintiff, it was actually written by MATOS, based in whole and/or in substantial part on the account WILCOX had vocalized during the interview and had demanded plaintiff adopt.

70.     The false statement that was prepared for plaintiff's signature claimed that plaintiff, Pierre Lyons, and Lavell Jones had gone to Mitchell's house, and that Jones had shot him.

71.     Defendants, including, but not limited to WILCOX and MATOS, improperly coerced plaintiff's false confession, and supplied the information to be included in the statement.

72.     Each and all of the defendants knew it was false, and/or had reason to believe, and/or should have known, it was false.

73.     In addition to the false statement, defendants, including, but not limited to WILCOX and MATOS, fabricated a false inculpatory oral statement, which they attributed to plaintiff.  WILCOX prepared a document claiming that plaintiff said to him "F*** you, Wilcox, I'm the funking [sic] man.  When they [referring to his friends] want to do a job, they come to me because I'm the mother-f***er who's going to do this."  WILCOX alleged that, at this point, plaintiff "made a motion with his hand, holding it out like a gun and pulling the 'trigger' with his finger."

74.     This alleged interaction, which WILCOX reduced to writing and memorialized for the investigative file, simply never happened, as defendants, including, but not limited to WILCOX and MATOS, knew.

75.     WILCOX and MATOS both later falsely testified concerning this alleged interaction and plaintiff's coerced false confession, including, but not limited to, before the Grand Jury and/or at trial.

76.     Sometime after plaintiff had been coerced to confess falsely to the murder and had signed the statement, his attorney, Gould, came into the room. Upon learning that plaintiff had signed a statement about the murder, Gould terminated the interview – too late, of course, to be of any benefit to plaintiff.

77.     The false statement defendants had elicited from plaintiff did not match the false statement that they had previously elicited from Parsons, and defendants, including WILCOX, MATOS, SBUTTONI, RYAN, MCKENNA, and BREEN collaborated to address it.

78.     To do so, they elicited another false statement from Parsons. In this one, given to WILCOX on October 10, 1997, Parsons claimed that, a week after the murder, plaintiff had spontaneously confessed to him. In this rendering, plaintiff had purportedly told Parsons that he, Jones, and Lyons had gone to Mitchell's apartment and that plaintiff had shot Mitchell.

79.     The statement made no reference to either Parsons's original, truthful statement to the police concerning his lack of knowledge of the murder, or his prior false statement claiming that he had "heard" that plaintiff and Abdul-Hameed had been the perpetrators.

80.     Defendants knew and/or had reason to know the statement was false.

81.     Defendants, including, but not limited to, WILCOX, supplied the false information to Parsons.

82.     Plaintiff was arrested for the murder on September 8, 1997, on the basis of his coerced, false confession.

83.     Defendants forwarded false, improperly procured information to the Albany District Attorney's office, including, but not limited to, plaintiff's coerced false confession, the false inculpatory oral statement allegedly made by plaintiff, and Parsons' false statements.

84.     Defendants facilitated Parsons' Grand Jury testimony, in which he parroted the account they had provided him for his third statement.

85.     Defendants knew that the false information they had provided and/or facilitated would be relied upon by the District Attorney's office and/or the Grand Jury and/or by a jury at trial.

86.     Plaintiff was simultaneously indicted for both the October 4, 1996, robbery and the February 18, 1997, murder, on October 28, 1997.

87.     To the extent it concerned the murder, the indictment was premised, in whole or in substantial part, on the coerced, false confession by plaintiff and/or the information in the final false statement by Parsons.

88.     Defendants failed to produce exculpatory evidence, including, but not limited to notes of interviews, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972).

**B.  Defendants' conduct regarding Mr. Dukes' co-defendants in the underlying case**

89.     Thereafter, defendants coerced a false confession from Lavell Jones.

90.     In doing so, they resorted to much the same playbook they had employed with plaintiff, and their conduct towards Jones is further reflective of the wanton disregard for truth that pervaded the investigation.

91.     On October 29, 1997, Jones was living in Brooklyn, New York.  That night, at approximately 9:00 p.m. or 10:00 p.m., he and a friend had been arrested by the New York City Police Department when they were pulled over for a traffic stop, and the friend was found to be carrying a firearm.

92.     Jones was taken first to the 77th Precinct in Brooklyn, and then to Central Booking. He did not sleep or eat that night.

93.     The Albany Police had been notified that Jones was being detained, and RYAN and MCKENNA came to New York to attempt to speak with him.

94.     Jones had been brought to the 88th Precinct. RYAN and MCKENNA began to speak with him at approximately 5:30 p.m. or 6:00 p.m.. At approximately 7:50 p.m., Jones signed a statement, admitting to involvement in the robbery.

95.     They then asked him about the murder, and he denied involvement. As with plaintiff, they refused to accept his truthful denial and coerced a false confession.

96.     When Jones' girlfriend, Sakina Mitchell, arrived at the precinct, they began to interrogate her as well. She denied that he had been involved, or that she had any knowledge. Defendant RYAN told her that, if she did not cooperate with them, Jones would receive the death penalty and her baby (she was pregnant at the time) "would be a bastard."

97.     RYAN and MCKENNA eventually presented her with a statement to sign that claimed Jones had admitted involvement in the murder to her. It was false, and was known to be false by defendants. It contained details she did not actually know. She signed it. She later testified that she had only done so because she was nervous and afraid, and believed defendants' representations that she was helping Jones by signing it.

98.     At approximately 11:00 p.m., RYAN and MCKENNA handcuffed Jones, and began to transport him back to Albany. He still had not slept, and was berated during the car ride about his alleged involvement in the murder.

99.     He was brought into an interrogation room in Albany, and began to question him. Defendants MATOS and SBUTTONI joined in.

13

100.  Jones maintained his innocence, and even used a typewriter that was in the room to type several, increasingly desperate statements to that effect during the periods he was alone.

101.  In addition to not sleeping, Jones did not eat. He had told the detectives he did not eat pork, and was given only a fast food sandwich containing pork sausage.

102.  Like plaintiff, defendants threatened Jones with the death penalty.

103.  By approximately 10:30 a.m. on October 31, 1997 – more than 36 hours after his arrest – he finally relented, and signed a statement with an account that defendants forced on him. He had not slept or eaten in more than two days.

104.  Defendants also elicited false statements and a false confession from Pierre Lyons. He had pleaded guilty to the robbery, and then, after a short incarceration, moved to Georgia.

105.  His sentence on the robbery had been 90 days and five years probation.

106.  In November of 1997, MATOS and SBUTTONI traveled to Georgia, where they induced him to sign a statement claiming that he had been outside the house when Dukes and Jones committed the crime, but had not been involved or had knowledge that a firearm was present.

107.  During Jones' criminal trial, they requested that he fly to Albany, on the premise that he would be a witness for the People against Jones. When he arrived, voluntarily, they told him that he needed to meet with detectives to prepare him for his testimony. Through this ruse, they induced him to submit a false confession.

108.  Defendants' conduct with Jones and Lyons further reflects and evidences their actual malice as it relates to plaintiff.

### C. Plaintiff's trial

109.    Plaintiff's trial commenced on or about November 6, 1998.

110.    There was no forensic evidence adduced at trial to tie plaintiff to the murder.

111.    At trial, defendant WILCOX testified falsely, including, but not limited to, in claiming that plaintiff had provided the details in his coerced confession; in denying that plaintiff had been threatened with the death penalty; in falsely claiming plaintiff had made inculpatory oral statements; and in otherwise failing to describe the circumstances of the interview directly.

112.    At trial, defendant MATOS testified falsely, including, but not limited to, with respect to his and WILCOX's interactions with plaintiff during the interview and plaintiff's statements.

113.    At trial, Parsons refused to testify that plaintiff was involved in the murder, losing the benefit of a favorable plea deal on the robbery he had been offered as inducement.

114.    At trial, Assistant District Attorney Cheryl Coleman read large portions of Parsons's false Grand Jury testimony, which defendants had facilitated.

115.    Plaintiff was found guilty of depraved indifference murder under Penal Law §125.25(2). He was acquitted of charges of first and second degree murder. He was also found guilty by the same jury of burglary and robbery of the premises at 195 Clinton Avenue on October 4, 1996.

116.    Plaintiff spoke at his sentencing. He apologized to the Mitchell family for his involvement in the robbery, but maintained that he was innocent of the murder and expressed his hope that the person who had perpetrated it would be brought to justice. He said: "I hope that in the future, they find this guy, they find the guy or people that killed Erik Mitchell because we didn't do it. We was involved in the robbery and that's all I feel you should get in trouble for.

15

They didn't have no other suspects but us so that was the only way they could close the case to make you all satisfied. That's all I got to say. I'm sorry. I'm sorry. I'm sorry, your Honor. Sorry. It's crazy, man."

117.    He was sentenced to twenty five years to life on the murder charge, and twelve and one-half to twenty five years on the robbery, based on the misapprehension the two offenses had been related.

118.    Plaintiff was incarcerated following and as a result of his murder conviction.

119.    Jones was also convicted of both the murder and the robbery. Pierre Lyons was tried for the murder, and was acquitted.

**D. Plaintiff's exoneration**

120.    On September 3, 2014, Jeffrey Conrad was arrested in Ohio for the stabbing death of his girlfriend. During his conversation with the Cuyahoga County police, he was asked "Have you killed anybody else?" Conrad responded affirmatively: "Yeah... [A]ctually I should because there are people in jail for that, and I should get them out of there. They been there for a long time, but that'll open up a whole 'nother can of worms."

121.    Conrad told the detectives that the people in jail "did a robbery, and I guess they were like – they got arrested for the robbery, but while they were in jail, I guess one of them supposedly bragged about killing him, and they didn't really kill him, so they ended up doing the time, I guess, because they did the robbery." He revealed that the name of the person he had killed was "a drug dealer" named Erik Mitchell.

122.    Conrad recounted that his girlfriend had lived, just as the Albany Police Department had been told, near Mitchell. He accurately stated to the Cuyahoga County police detectives the time of night the murder had taken place, the caliber of the bullet he had used, that

the shooting took place at Mr. Mitchell's doorway, and that Mr. Mitchell had been clothed at the time despite the time of night. He also accurately described the distance he had been from Mitchell when he fired shots.

123.    The Cuyahoga police reported Conrad's confession to their counterparts in Albany. Two Albany detectives later interviewed Mr. Conrad.

124.    During the conversation, Conrad provided the detectives with further details about why he had killed Mitchell, and how he had done it. He correctly described the distinctive position in which the body had fallen. He also derided them for their department's having incarcerated innocent men for the crime he had committed. "So what kind of confession they gave you?", he mockingly asked an Albany detective. "They just said, what, 'I did it'? That's all they can do. Don't tell me what they f***ing had. They didn't have s**t. They didn't do it. What the f**k could they tell you? Nothing. Complete bulls**t. You can't bulls**t me."

125.    Conrad did not receive any consideration for his confessions, which were made against his penal interest.

126.    After the Albany authorities advised him of Mr. Conrad's confession, plaintiff brought a motion to vacate his conviction, pursuant to N.Y. CPL §440.10. The People joined in his motion, to the extent it sought vacatur based on the discovery of new evidence.

127.    On July 7, 2016, Supreme Court, Albany County (Breslin, J.) granted the motion, and vacated all of plaintiff's convictions. The Court then, without opposition from the People, dismissed all of the charges against Mr. Dukes arising from offenses that were alleged to have taken place on February 18, 1997.

128. All that remained standing at this point were the charges concerning the October 4, 1996, robbery. Plaintiff pleaded guilty to robbery in the first degree, with a sentence of 7 to 14 years.

129. This plea offer was grossly disproportionate to the severity of the offense. Lyons had received a jail term of only 90 days for his participation in the robbery. Abdul-Hameed had also pleaded to a substantially lesser term of incarceration on the robbery.

130. But for the posture in which the robbery plea arose, plaintiff would have received a markedly shorter plea offer, and/or otherwise would not have pleaded to or been sentenced to a term of 7 to 14 years.

131. Even if he had been sentenced to a term of that length, absent the wrongful murder conviction he would not have served a full sentence.

132. As he had already served substantially longer than the maximum time he could have been incarcerated under that sentence, he was immediately released.

133. After plaintiff had been exonerated, the Assistant District Attorney who had prosecuted him, Cheryl Coleman, gave an interview to the Albany Times Union. She acknowledged that there had been "weird things" about the case and that she accepted the possibility plaintiff and Jones were both innocent.[1]

134. Defendants WILCOX, MATOS, MCKENNA, RYAN, SBUTTONI, and BREEN acted in coordination and concert with one another to bring about plaintiff's wrongful conviction.

135. Defendants forwarded the false evidence referenced above against plaintiff to prosecutors, including, but not limited to, the false confession from plaintiff, the falsely recorded

---

[1] *See* Brendan J. Lyons, "Who Pulled the Trigger?," Albany Times Union, February 7, 2015, http://www.timesunion.com/local/article/Who-pulled-the-trigger-6069075.php#photo-7495820 (last accessed August 7, 2017).

oral statement from plaintiff, and the false statements from Parsons, including, but not limited to, before he was charged.

136. Defendants' conduct regarding Jones and Lyons was in furtherance of the same objectives and undertaken for the same motives as their conduct towards plaintiff.

137. Each and all of the acts and omissions set forth herein were undertaken in clear violation of plaintiff's established constitutional rights, and defendants affirmatively knew as much.

138. Each and all of the acts and omissions set forth herein were undertaken in clear violation of plaintiff's established constitutional rights, and no reasonably competent police officer could have believed otherwise.

139. Each and all of the defendants knew of the foregoing acts of misconduct by their fellow officers, at and/or substantially contemporaneously with the time such acts took place.

140. Each and all of the defendants were deliberately indifferent to the violations of plaintiff's rights.

## As and For a First Cause of Action against defendants WILCOX, MATOS, MCKENNA, RYAN, SBUTTONI, and BREEN:  Malicious Prosecution Pursuant to 42 U.S.C. §1983

141. Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 140 as though set forth more fully herein.

142. Defendants WILCOX, MATOS, MCKENNA, RYAN, SBUTTONI, and BREEN initiated the proceeding concerning the murder charges against plaintiff.

143. The proceeding against plaintiff with respect to the murder terminated in his favor, with the vacatur of his conviction and dismissal of such charges on July 7, 2016.

144. The fabricated and/or otherwise improperly obtained evidence against plaintiff, including, but not limited to, the coerced false confession from plaintiff, invented inculpatory

19

oral statement alleged to have been made by plaintiff, and false statements and testimony by Parsons were the basis for his arrest and/or indictment for murder.

145.    In the absence of the false, fabricated, improperly created and/or obtained evidence, there was not probable cause to arrest and/or indict plaintiff for murder.

146.    The decisions to arrest and/or indict plaintiff for murder relied substantially upon the false, fabricated, improperly created and/or obtained evidence.

147.    Defendants were motivated by actual malice, including, but not limited to, in that each and all of them knew that the evidence against plaintiff had been fabricated and/or otherwise improperly created and/or obtained, and/or were motivated by some purpose other than to see the ends of justice served.

148.    By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

149.    Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities secured by the United States Constitution, including, but not limited to, the Fourth and Fourteenth Amendments thereto.

150.    By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

151.    By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

152.    Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

**As and For a Second Cause of Action against WILCOX, MATOS, MCKENNA, RYAN, SBUTTONI, and BREEN:  Denial of Fair Trial Rights Pursuant to 42 U.S.C. §1983**

153.    Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 152 as though set forth more fully herein.

154.    Defendants WILCOX, MATOS, SBUTTONI, RYAN, BREEN, and MCKENNA were investigating officials with respect to plaintiff's purported involvement in the murder of Erik Mitchell.

155.    Defendants WILCOX, MATOS, SBUTTONI, RYAN, BREEN, and MCKENNA, acting individually and in concert, fabricated evidence, including, but not limited to, the coerced false confession from plaintiff, invented inculpatory oral statement alleged to have been made by plaintiff, and false statements and testimony by Parsons.

156.    Defendants WILCOX, MATOS, SBUTTONI, RYAN, BREEN, and MCKENNA knew that the fabricated evidence would be likely to influence a jury's decision.

157.    Defendants WILCOX, MATOS, SBUTTONI, RYAN, BREEN, and MCKENNA forwarded the fabricated evidence to prosecutors, and facilitated Parsons's Grand Jury testimony.

158.    Defendants failed to produce to the District Attorney's Office exculpatory information that would have materially benefitted the defense, thereby bringing about violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972).

159.    By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

160.    Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities

secured by the United States Constitution, including, but not limited to, the Fifth, Sixth, and Fourteenth Amendments thereto.

161. By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

162. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

163. Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

**As and For a Third Cause of Action against WILCOX, MATOS, MCKENNA, RYAN, SBUTTONI, and BREEN: Violation of the Right Against Self-Incrimination and/or to Obtain Inculpatory Statements, Pursuant to 42 U.S.C. §1983**

164. Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 163 as though set forth more fully herein.

165. Defendants used coercion to obtain a waiver of plaintiff's rights against self-incrimination and/or to obtain a false inculpatory statement, including, but not limited to, in the procurement of plaintiff's false confession.

166. Plaintiff was under the age of 21 at the time and had limited formal education.

167. Defendants acted in concert with one another to deceive and/or induce plaintiff's lawyer to bring him to the courthouse on a day when his presence would not otherwise have been required, and to interrogate him without counsel in a context where he would be less apt to perceive his ability to remain silent and/or to terminate the interview.

168. The statement was obtained in a custodial context, without the presence of counsel, and without defendants having read plaintiff his *Miranda* rights.

169.    The statement was obtained after defendants had falsely written into plaintiff's earlier statement about the robbery that he had knowledge of the murder, which had been done with the intent of coercing him to make a statement about the murder.

170.    The statement was obtained after plaintiff had been subjected to a prolonged interrogation, during which he had repeatedly and truthfully denied involvement in the murder and begun crying, and defendants had refused to accept his statements and demanded he say otherwise.

171.    The statement was obtained after defendants MATOS and WILCOX had threatened plaintiff with the death penalty if he did not tell them what they wanted to hear.

172.    The statement was obtained after defendants foisted a false version of facts on plaintiff and demanded that he adopt that story as his own.

173.    Under the circumstances that existed, plaintiff was unable to make a knowing and voluntary decision with respect to the confession.

174.    The confession was obtained under circumstances by which plaintiff's will had been overcome, and it was not a product of a knowing and voluntary decision on his part.

175.    Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions in violation of 42 U.S.C. §1983, by depriving him of rights, privileges, and immunities secured by the United States Constitution, including, but not limited to, the Fifth and Fourteenth Amendments thereto.

176.    By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the requirement for future medical care, and other and further damages.

177. By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

178. Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

### As and For a Fourth Cause of Action against the CITY OF ALBANY, Pursuant to 42 U.S.C. §1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

179. Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 178 as though set forth more fully herein.

180. The need for training of police detectives in techniques and/or procedures to avoid producing false confessions and/or witness statements was, at all times herein mentioned, obvious, including, but not limited to, at the times the individual defendants were hired and employed, and was in fact obvious to defendant CITY OF ALBANY.

181. It was equally obvious that the failure to provide such training and/or to institute such procedures would inevitably result in false confessions and/or witness statements, as police officers lacking the requisite training are substantially more likely, whether intentionally or otherwise, to obtain such false confessions.

182. Defendant CITY OF ALBANY provided its police detectives, including, but not limited to, the individual defendants herein, with no and/or virtually no training in how to avoid eliciting false confessions and/or witness statements, and provided no and/or virtually no monitoring for such purpose.

183. Defendant was deliberately indifferent to the need for such training and/or monitoring.

184.    Defendant CITY OF ALBANY's written training materials, as were provided to the individually named defendants herein at the times they were hired, contained no guidance as to techniques and/or procedures to avoid eliciting coerced and/or false confessions and/or statements, and/or no prohibitions on particular techniques and/or practices that would produce a likelihood of such confessions and/or statements.

185.    The training materials were, on the other hand, replete with references to how to coax confessions out of suspects, such as by minimizing the crime or blaming it on the victim or another person.

186.    The list of recommended interrogation approaches given to trainees solely consisted of ways to bring about inculpatory statements, and included no instruction on how to avoid false ones.

187.    In 1996 through 1998, defendant CITY OF ALBANY had no written policies and/or guidelines as to how to avoid false confessions and/or witness statements, and/or prohibitions on techniques and/or practices that would produce a likelihood of such confessions and/or statements.

188.    At and around the time of the underlying occurrences, detectives in the police department of the CITY OF ALBANY would have markedly greater responsibilities for investigating incidents, interviewing witnesses, and attempting to elicit confessions than would police officers of other ranks, such as patrolmen.

189.    At the times the individual defendants were hired and/or became detectives, defendant CITY OF ALBANY would provide no and/or virtually no formal training to persons promoted to and/or assigned the rank of detective.

190. At the times the individual defendants were hired and/or became detectives through 1998, defendant CITY OF ALBANY provided its detectives with no other and/or further training courses relating specifically to interview and interrogation techniques.

191. In 1996 through 1998, defendant CITY OF ALBANY's Standard Operating Procedures contained no and/or grossly insufficient guidance with respect to practices prohibited during interrogations and/or witness interviews, and no and/or virtually no procedures to prevent or diminish the likelihood of inaccurate and/or false statements and/or confessions.

192. At and around the time of the underlying occurrences, and at the times the individual defendants were hired and/or became detectives, defendant CITY OF ALBANY did not train detectives about the contents or significance of the contents of Standard Operating Procedures as they related to witness and/or suspect interviews.

193. In 1996 through 1998, defendant CITY OF ALBANY had no written policies and/or guidelines requiring the audio or video taping of suspect interviews, and/or retained and/or continued to engage personnel whom it knew or should have known would fail to act within the boundaries of the law, including the individually named defendants herein.

194. Defendant CITY OF ALBANY ignored misconduct by its employees, and did so for a prolonged period of time. In her interview with the Albany Times Union, plaintiff's prosecutor, ADA Coleman, said: "Everyone 'confessed' back then, and of course there was no video and no audio and it was all written."[2]

195. The investigation of the murder of Erik Mitchell showed the consequences of the CITY OF ALBANY's deliberate indifference to the constitutional rights of suspects on full

---

[2] *See* Brendan J. Lyons, "Who Pulled the Trigger?," Albany Times Union, February 7, 2015, http://www.timesunion.com/local/article/Who-pulled-the-trigger-6069075.php#photo-7495820 (last accessed August 7, 2017).

display.  The detectives had latched on to three suspects – plaintiff, Jones, and Lyons.  They obtained false confessions from all three men, for a crime none had anything to do with, and had been committed by a person who was not even known to them.

196.     As set forth more fully above, plaintiff was coerced to give a false confession, with the details having been foisted upon him by the detectives.

197.     As also set forth more fully above, Jones was detained over a prolonged period of time, denied food and sleep, subjected to the same kinds of coercive tactics as was plaintiff, and was ultimately coerced to confess falsely as well.

198.     In addition confessing, Jones and Dukes were also coerced and/or induced to implicate one another and Lyons at the same time, and through the same techniques.

199.     As set forth more fully above, Lyons was tricked into coming to Albany, was told he was talking to detectives merely to prepare for trial, and was cajoled and/or coerced to implicate not only Jones and Dukes, but himself as well.

200.     Parsons was also induced and/or coerced, after having initially told officers he knew nothing of the murder, to give two separate false statements, on each occasion giving the detectives the statements they wanted from him.

201.     Over the course of their investigation in this case, officers of the CITY OF ALBANY police department produced three false confessions (from plaintiff, Jones, and Lyons) and at least five separate statements in which witnesses inculpated others (from plaintiff, Jones, Lyons, Parsons, and Sakina Mitchell).

202.     The detectives' misconduct as alleged took place in, and was enabled by, the departmental cultural context created by the CITY OF ALBANY's deliberate indifference to the

risk of false statements and/or confessions in the absence of good and sufficient training and/or monitoring.

203. By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

204. By reason of the foregoing, plaintiff demands judgment against defendant CITY OF ALBANY in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS).

205. Plaintiff further claims attorneys' fees, pursuant to 42 U.S.C. § 1988.

### As and For a Fifth Cause of Action: Malicious Prosecution under New York State Law

206. Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 205 as though set forth more fully herein.

207. Defendants initiated the proceeding against plaintiff.

208. There was a lack of probable cause

209. The proceeding against plaintiff with respect to the murder terminated in his favor with the dismissal of such charges on July 7, 2016.

210. The fabricated and/or otherwise improperly obtained evidence against plaintiff, including, but not limited to, the coerced false confession from plaintiff, invented inculpatory oral statement alleged to have been made by plaintiff, and false statements and testimony by Parsons were the basis for his arrest and/or indictment for murder.

211. In the absence of the false, fabricated, improperly created and/or obtained evidence, there was not probable cause to arrest and/or indict plaintiff for murder.

212. The decisions to arrest and/or indict plaintiff for murder relied substantially upon

the false, fabricated, improperly created and/or obtained evidence.

213.     Defendants were motivated by actual malice, including, but not limited to, in that each and all of them knew that the evidence against plaintiff had been fabricated and/or otherwise improperly created and/or obtained, and/or were motivated by some purpose other than to see the ends of justice served.

214.     By reason of their conduct, plaintiff was subjected to a deprivation of liberty, including, but not limited to, in his pretrial detention and subsequent incarceration.

215.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the requirement for future medical care, and other and further damages.

216.     By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

### As and For a Sixth Cause of Action against CITY OF ALBANY: Negligence

217.     Plaintiff repeats, realleges, and incorporates the allegations set forth at items 1 through 216 as though set forth more fully herein.

218.     Defendant CITY OF ALBANY was negligent in the hiring and retention of the defendant officers.

219.     Defendant CITY OF ALBANY knew and/or should have known that the aforesaid officers were not fit to continue in such employment, including, but not limited to, based upon the acts set forth herein.

220.     Defendant was negligent in training the defendant officers, including, but not limited to, in its failure to provide good and sufficient training with respect to procedures to avoid the production of false confessions and/or statements, and in failing to supervise and/or supervise adequately said officers.

221.     Defendant knew and/or should have known that the lack of such training and/or supervision would produce violations of right and/or injuries to persons, including, but not limited to, the plaintiff herein.

222.     Defendant is liable for the negligent acts of its employees, to the extent set forth above.

223.     Defendant's negligence caused plaintiff's wrongful conviction.

224.     By reason of the foregoing, plaintiff suffered severe damages, including, but not limited to, the deprivation of liberty for his term of imprisonment, permanent physical and/or psychological injuries, economic loss, the need for future medical care, and other and further damages.

225.     By reason of the foregoing, plaintiff demands judgment against the defendants in the amount of $50,000,000.00 (FIFTY MILLION DOLLARS), and punitive damages against the individual defendants.

### Conclusion

WHEREFORE, plaintiff demands judgment on the first cause of action against defendants WILCOX, MATOS, MCKENNA, RYAN, BREEN, and SBUTTONI in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); on the second cause of action against defendants  WILCOX, MATOS, MCKENNA, RYAN, BREEN, and SBUTTONI in the sum of in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); on the third cause of action

against defendants WILCOX, MATOS, MCKENNA, RYAN, BREEN, and SBUTTONI in the sum of in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); on the fourth cause of action against the CITY OF ALBANY in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); on the fifth cause of action against defendants in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); on the sixth cause of action against the CITY OF ALBANY in the sum of $50,000,000.00 (FIFTY MILLION DOLLARS); punitive damages against defendants WILCOX, MATOS, MCKENNA, RYAN, BREEN, and SBUTTONI; attorneys' fees, pursuant to 42 U.S.C. § 1988 and the inherent powers of the Court; the costs and disbursements of this action; and such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
      August 7, 2017

                    Respectfully submitted,

                       s/
                    Joshua D. Kelner
                    Bar Roll Number: 520151
                    Attorney for Plaintiff CARL DUKES
                    KELNER & KELNER, ESQS.
                    140 Broadway, 37th Floor
                    New York, New York 10005
                    Telephone: (212) 425-0700
                    Fax: (212) 425-0700
                    E-mail: jkelner@kelnerlaw.com